1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
 2                   HOUSTON DIVISION

 3  CASEY NELSON, et al        *   Civil No. 4:17-cv-02171
                               *
 4  VERSUS                     *   Houston, Texas
                               *   June 14, 2019
 5  TEXAS SUGARS, INC., et al  *   2:00 p.m.

 6
                         DOCKET CALL
 7        BEFORE THE HONORABLE ALFRED H. BENNETT
              UNITED STATES MAGISTRATE JUDGE
 8

 9  For the Plaintiffs:

10          Mr. Warren A. Berlanga
            Wyly & Cook, PLLC
11          1415 North Loop West
            Suite 1000
12          Houston, Texas 77008

13

14  For the Defendants:

15          Mr. William Xander King
            Mr. Casey T. Wallace
16          Mr. Benjamin W. Allen
            Wallace & Allen, LLP
17          440 Louisiana
            Suite 1500
18          Houston, Texas 77002

19

20  Court Reporter:

21          Fred Warner
            Official Court Reporter
22          515 Rusk Ave.
            Houston, Texas 77002

23

24  Proceedings recorded by mechanical stenography, produced by
    computer aided transcription.
25
```

1          THE COURT:  Cause No. 4-17-CV-2171, Casey Nelson, et

2   al versus Texas Sugars, Inc., et al.

3          Counsel, please announce your appearances for

4   the record.

5          MR. BERLANGA:  Warren Berlanga, counsel for the

6   plaintiffs, Your Honor.

7          MR. KING:  William King.

8          MR. WALLACE:  Casey Wallace for the defendants, Your

9   Honor.

10          MR. ALLEN:  Ben Allen for the defendants.

11          THE COURT:  Counsel, this is your docket call.

12   Plaintiffs, are you ready to proceed to trial?

13          MR. BERLANGA:  We are, Your Honor.

14          THE COURT:  Defense ready to proceed to trial?

15          MR. KING:  Yes, Your Honor.

16          THE COURT:  Very well.

17          The first thing by way of pretrial matters for

18   the plaintiff, anything we need to take care of, address?

19          MR. BERLANGA:  Yes, Your Honor.  We have a motion to

20   exclude certain witness testimony on file, Your Honor; and I

21   think it would be helpful to prepare for trial to discuss

22   that here with the Court.

23          THE COURT:  Very well.  Proceed.

24          MR. BERLANGA:  Your Honor, this case is a collective

25   action involving exotic entertainers.  It's been certified by

1   the Court as such.  And during the course of this litigation

2   it came to our attention that the defendant approached

3   certain exotic entertainers who were still working for the

4   club and solicited statements from them essentially to help

5   bolster the defendants' case.

6             Now, federal courts across the country have

7   recognized the inherent coercive nature of such

8   communications in these kind of declarations from current

9   employees given the economic relationship between the

10  parties.  So with that being said, two of the these

11  declarants were not disclosed in the class list provided by

12  defendants to plaintiffs.  As it turns out, we actually

13  deposed the declarants.  As you will recall, Your Honor

14  granted us limited discovery to deposed declarants and figure

15  out the circumstances under which the declarations arose.

16            At the depositions each of these declarants

17  showed up with a lawyer.  Prior to that lawyer's involvement

18  I had been communicating with counsel for the club about

19  scheduling the entertainers' depositions.  And let's keep in

20  mind the crux of this case is whether these entertainers are

21  employees or independent contractors.

22            So I was communicating with the club, and then

23  out of nowhere this gentleman contacts me and says, I

24  represent all four of these declarants; I'll accept service

25  on their behalf.  I said okay.  We end up deposing all four

1   of them.  The lawyer --

2         THE COURT:  Let me kind of short circuit this.  What

3   are you specifically trying to exclude, their declarations,

4   their deposition testimony or their live testimony?

5         MR. BERLANGA:  All, Your Honor.

6         THE COURT:  Why wouldn't they be allowed to be

7   called as witnesses?  What would exclude them from coming to

8   court as live witnesses?

9         MR. BERLANGA:  Yes, Your Honor.

10         At their depositions the declarants refused to

11   answer relevant and discoverable questions concerning

12   specifically who is paying for their lawyer, how they came to

13   find him, and all matters related to --

14         THE COURT:  Did you file a motion to compel

15   afterwards?

16         MR. BERLANGA:  Well, Your Honor only granted us the

17   four depositions and no broader discovery, so I am unable to

18   at this time.

19         THE COURT:  I don't think that follows from that.  I

20   think that to the extent that you had discovery that I

21   ordered, which was these depositions, to the extent that they

22   did not cooperate with you, I would have been receptive to

23   you filing a motion to compel.

24         MR. BERLANGA:  Well, Your Honor, I think the motion

25   that we have filed asks the Court for a continuation

1  deposition, so I think in a sense that is a motion to compel
2  answers on these questions.
3          THE COURT:  You are scheduled to start trial Monday.
4  When do you expect to do a continuation deposition?
5          MR. BERLANGA:  Well, Your Honor, I need to know who
6  is paying for this lawyer.  And as it turns out, it's
7  Moments.  We have now discovered that thanks to Moments'
8  response to the motion to exclude.  And on that basis, when
9  you have a litigant that is funding a non-party fact
10 witness's attorney, that raises all kind of problems, Your
11 Honor.
12         THE COURT:  I think so, too; but wouldn't that be
13 something perfect to bring out on cross-examination in front
14 of a jury, if in fact they're called to the stand; and to the
15 extent that it is as troubling as you say and you point that
16 out in front of the jury, that goes to what the defendants
17 are doing in this case, would it not?
18         MR. BERLANGA:  I agree, Your Honor.  Should the
19 Court allow the testimony, I would certainly do that.
20              However, I think given the circumstances, given
21 the course of nature of these communications in the first
22 place, this kind of conduct I think is inappropriate in a
23 collective action setting.
24         THE COURT:  I would have been receptive to that had
25 it been brought to my attention on a basis where I could have

1  dealt with it as opposed to the Friday evening before a

2  Monday trial setting.

3           MR. BERLANGA:  Your Honor, I filed this motion just

4  a week or two after the depositions.  I mean, the last

5  deposition was in May.

6           THE COURT:  Anything else on this issue?

7           MR. BERLANGA:  On this particular issue, no, Your

8  Honor.

9           THE COURT:  Counselor.

10          MR. KING:  Yes, Your Honor.

11              This particular issue is extensively briefed.

12  Plaintiffs have filed a 20-page-long motion.  I filed a

13  20-page-long response last night explaining this issue is a

14  non-issue; that these witnesses were deposed by counsel for

15  over four hours.  They asked every -- they answered every

16  relevant question that was posed to them.

17          THE COURT:  Well, they answered every, according to

18  counsel, every question that was relevant, that was deemed

19  relevant by their lawyer.  They were instructed not to answer

20  certain questions, it appears.  Is that not correct?

21          MR. KING:  There were some questions; that is

22  correct.  For example:  What are your children's names?

23  That's one that springs to mind.

24          THE COURT:  Well, that's not one I'm concerned

25  about.

1           But "who paid the lawyer's fees," it seems to

2  me that that would be relevant.  Why wasn't that question

3  answered?

4           MR. KING:  That question was not answered because at

5  that point I don't think that the attorney who represented

6  them, Mr. Pianelli, was interested in the counsel's conduct

7  during the deposition; and he gets exasperated and I think

8  that he probably would have made an improper objection.

9  Moments did not object to those questions.

10          THE COURT:  So now you have dropped this in my lap.

11  What am I supposed to do the Friday evening before trial,

12  counsel?

13          MR. KING:  I don't see how this could hinder

14  proceeding to trial, Your Honor.

15          The retention of Mr. Pianelli was brought about

16  after the last docket call where I was accused in open court

17  of coercing these witnesses, forcing them to sign statements,

18  when nothing could be further from the truth.

19          If I have an attorney on the other side lodging

20  baseless accusations against me and I have a federal court

21  ordering me to produce phone numbers and to get these

22  witnesses deposed, I run the risk of looking like I am trying

23  to coerce them into testifying or that I am having some sort

24  of improper communications.

25          Having an independent lawyer made available for

1  them was a firewall to prevent against further accusations

2  and to make sure that these witnesses would understand how to

3  comply with the subpoena obligations.

4          THE COURT:  How independent could that attorney be

5  if in fact he was being paid by the defendants?

6          MR. KING:  Because Mr. Wallace and I conferred about

7  who truly respects their professional obligations, and Mr.

8  Pianelli's name came up as somebody who takes it very, very

9  seriously as a former member of the grievance committee.

10              If the Court reviews the transcripts -- and

11  these transcripts are heavily cited -- I think the Court

12  would realize that this is a non-issue, this is trumped up to

13  try and delay trial all over again and to prevent these

14  witnesses from testifying because they don't offer the same

15  narrative that the plaintiffs' clients, Mr. Berlanga's

16  clients have offered.  They are not happy with the answers.

17  As Your Honor pointed out, that's an issue for

18  cross-examination.

19          THE COURT:  Anything else?

20          MR. BERLANGA:  Your Honor, I would just add to that,

21  we are not seeking to delay trial.  I announced ready.  We

22  are ready to go.  We just think these witnesses should be

23  excluded given that the testimony has been tainted.

24          THE COURT:  As to the live testimony of these

25  witnesses, the motion is denied.

1            What's next from the plaintiff?

2            MR. BERLANGA:  Your Honor, other than typical

3    pretrial matters there are no other outstanding motions on

4    the table at this time other than the motion --

5            THE COURT:  Let's move to those typical pretrial

6    matters.  What other rulings do you need before trial

7    commences on Monday?

8            MR. BERLANGA:  We have motions in limine that have

9    been filed, Your Honor.

10           THE COURT:  Very well.  And that is Document No. 44,

11   correct?

12           MR. KING:  Yes, Your Honor.

13           THE COURT:  Ms. Edwards, please print that out.

14           All right.  Let's turn our attention now to

15   Item No. 1, plaintiffs' reason for leaving their employment.

16   You're suing their previous employer for not paying their

17   wages, and you want to prevent the question as to why did you

18   leave your job?

19           MR. BERLANGA:  Yes, Your Honor.  Wage and hour

20   litigation.  The only questions that would be relevant in

21   this case that the jury is going to be asked to decide are:

22   What did plaintiff do, job duties, and how many hours did

23   they work?  The circumstances under which they leave their

24   employment aren't relevant to the actual inquiry in this

25   case.

1    THE COURT:  Counselor.

2    MR. KING:  The circumstances of their termination

3  are absolutely relevant, Your Honor.  Our client had to let

4  them go because one of them got into a drunken altercation.

5  The other one was accused of stealing money.  This goes to

6  their credibility, it goes to their bias and it goes to their

7  motive for bringing this lawsuit.

8    THE COURT:  This issue has nothing to do with

9  whether or not they were paid the wages that they were due.

10    You believe that you are going to be able to

11  establish that the reason that they filed this federal

12  lawsuit is that they were fired?  Did I understand you

13  correctly?

14    MR. KING:  No, Your Honor.  What I just said is not

15  the primary point of any of this evidence.

16    THE COURT:  Okay.  Well, tell me what the primary

17  point of this evidence is, the relevance of it.

18    MR. KING:  Well, it goes to their credibility as

19  witnesses on the stand, Your Honor.

20    THE COURT:  How does that go to their credibility as

21  to how they left their employment?

22    MR. KING:  Because these individuals have an ax to

23  grind.  It also goes to their status as independent

24  contractors because they were free to come and go as they

25  pleased generally speaking.  But if somebody at the club

 1  breaks the law and gets into a fight with a patron, they're
 2  not allowed to come back.  It's as simple as that.
 3           One of the plaintiffs was let go, and a week
 4  later she's filing a lawsuit.
 5           THE COURT:  That's a host of reasons why you believe
 6  this is relevant.  One, you believe a week later they filed
 7  this lawsuit, which I read or take to mean that you believe
 8  that this is a trumped-up lawsuit because they were not
 9  allowed to come back to the establishment to work.
10           Also it goes to their credibility because they
11  got into a fight at their job.
12           MR. KING:  Because they were let go and felt they
13  should have not been let go, Your Honor.  And this is
14  basically a lawsuit brought to get back at the club.
15           THE COURT:  Counselor, you said one of the issues in
16  this case was whether or not they were an employee or a
17  independent contractor, correct?
18           MR. BERLANGA:  Correct, Your Honor.
19           THE COURT:  Well, to the extent that they were being
20  informed, either as a independent contractor or as an
21  employee, that they could no longer work there, why wouldn't
22  it go to that issue if no other issue?
23           MR. BERLANGA:  There is no dispute about that issue,
24  Your Honor.
25           THE COURT:  About which issue?

1          MR. BERLANGA:  About whether they can be let go, or

2     really I think --

3          THE COURT:  Well, I think maybe you missed my point.

4     You don't fire independent contractors.  You just no longer

5     work with them.  If it's a employee, they're fired.

6          MR. BERLANGA:  Well, the testimony from the

7     corporate representative is that they're not fired.  They're

8     asked not to come back.  So to the extent that the parties

9     have a dispute about that, well, the facts can bear that out.

10          THE COURT:  How can the fact bears that out if we

11     motion in limine out that issue?

12          MR. BERLANGA:  Well, we are not limineeing out the

13     issue that they can be let go or terminated.  It's the

14     circumstances under which they were let go.  And that's what

15     Moments wants to get into here.  They want to get into the

16     improper bad character-type argument, and that's just not

17     central or relevant to the issues at hand.  And even if it is

18     minimally relevant, I think the prejudice to my clients and

19     the danger of misleading and confusing the jury about what

20     the real issues in the case are substantially outweighs any

21     minimal relevance that might have.

22          MR. KING:  Your Honor, if I might --

23          THE COURT:  Just a moment.

24               As to Motion in Limine No. 1, it is denied.

25               Go on to No. 2.

1          MR. BERLANGA:  Your Honor, this is sort of in the

2     same vein as No. 1.  The defendants want to make this case

3     about the bad character of my clients.  And I think, again,

4     it's not relevant that they had personal conflicts with other

5     entertainers at the establishment.

6          THE COURT:  Well, to the extent they had conflicts

7     with other employees, what is the relevance of that in a wage

8     dispute?

9          MR. KING:  Your Honor, we don't intend to focus on

10    these issues.  The issues in this case are the working

11    conditions of the performers of Moments because the central

12    issue is the employee/independent contractor dichotomy other

13    than to the extent that, for example, witnesses are asked

14    about what do managers do.  The one things that managers do

15    is they break up fights between dancers.  That's one relevant

16    reason.

17          Another relevant reason is if I have got a

18    witness up here saying that one of our witnesses is a liar,

19    well, maybe they got into a fight in the past.  Interpersonal

20    conflicts at a place like this are entirely relevant to the

21    credibility of the testimony that is offered.

22          THE COURT:  It's granted for now.

23          Item No. 3.  Counselor.

24          MR. BERLANGA:  Yes, Your Honor.

25          This limine point is geared towards employment

1  that my clients may have had before Moments.  What they did

2  or did not do with a previous employer really isn't relevant

3  to this employer's obligation under the wage and hour laws.

4  THE COURT:  So you're not going to go into your

5  clients' prior work history at all.  They're just going to

6  show up in the world and their first job is at Moments.

7  That's what you're going to do with your witnesses?

8  MR. BERLANGA:  It's not central to any of the issues

9  that the jury is going to be asked to decide, Your Honor.

10  THE COURT:  That's not the question I asked you.

11  So when you put your witnesses, your clients on

12  the stand and you are introducing them to the jury, you are

13  not going to talk about any of their work history prior to

14  them working at Moments?

15  MR. BERLANGA:  I'll probably ask, when did you first

16  start working as an exotic entertainer and when did you first

17  start working at Moments.

18  THE COURT:  Okay.  Well, if you open up the door as

19  to when they first start working as a exotic dancer, you have

20  opened the door as to where they worked before.

21  MR. BERLANGA:  I agree.  Should I open the door,

22  then I've opened the door, yes.

23  THE COURT:  Counselor.

24  MR. KING:  This is relevant to the impermanence

25  factor under the economic realities test which is a component

1   of the jury charge that was submitted, that being dancers

2   tend to be transient and they've worked at other gentlemen's

3   clubs.  I think it's entirely relevant.

4            THE COURT:  How is it relevant as to whether or not

5   they were properly paid at Moments?

6            MR. KING:  Because it goes to one of the factors

7   that's explained in the jury charge.

8            THE COURT:  Point me directly to what you are

9   referring to.

10           MR. KING:  Certainly, Your Honor.  It would be

11   Instruction No. 5 under Question No. 1 in defendants' --

12           THE COURT:  What document number are you referring

13   to, counsel?  I'm sorry.

14           MR. KING:  It's 43-9, Your Honor.

15           THE COURT:  43-9, Exhibit C5, Defendants' Proposed

16   Jury Instructions.  I'm there.  What specific question?

17           MR. KING:  It's under Question No. 1.

18           THE COURT:  Question number -- hold on.  Let me get

19   there.  Question No. 1, yes, sir.

20           MR. KING:  Yes, Your Honor.  It's No. 5, last

21   sentence.  Employees ordinarily work for just one or for a

22   few employers and do not have business names or listings.

23           THE COURT:  Okay.  What does that have to do with

24   where they worked prior to coming to Moments?

25           MR. KING:  Because it shows the free-flow of exotic

1    dancers within this particular industry, which is indicative

2    of employee status, Your Honor.  Employees tend to be more

3    permanently affixed to a particular business.

4             MR. BERLANGA:  If I may.

5             THE COURT:  If the employee in question or plaintiff

6    in question was working at the same time for another

7    establishment, then that's fair game to go to the issue of

8    whether or not she was a independent contractor.  Otherwise

9    this motion in limine is granted, and to the extent that you

10   have another reason for bringing it up, then approach the

11   bench.

12             Turning our attention to Item No. 4.

13             MR. BERLANGA:  Your Honor, it is almost axiomatic in

14   wage and hour litigation that the party's subjective intent

15   is not a factor to be considered.  It's the economic

16   realities of the working relationship and ultimate touchstone

17   of the economic realities test for independent contractor and

18   feels the litigation is the worker's dependence on the

19   alleged employer.  The courts have said almost expressly

20   that subjective intent doesn't control.  I mean, it's almost

21   entirely irrelevant.

22             THE COURT:  I am not following you.

23             MR. BERLANGA:  Sure, Your Honor.

24             The central inquiry in the independent

25   contractor versus employee analysis is the economic realities

1  factors.  None of those factors considers the subjective

2  intent of the parties.  And courts have, even courts in the

3  Southern District of Texas have noted that the subjective

4  intent of the parties isn't determinative of the economic

5  realities test, the actual working relationship from the

6  parties.  It's of no moment.

7          THE COURT:  Counselor.

8          MR. KING:  Yes, Your Honor.

9              In defendants' jury charge again -- and this is

10  taken from the Fifth Circuit's pattern jury instruction --

11  No. 6, Instruction No. 6 on page 7 asks, what was the intent

12  of plaintiff and defendant Sugars?  The party's intent is

13  always important.

14          THE COURT:  How does that fit in with whether or not

15  they believe that they were entitled to overtime?

16          MR. KING:  I don't know that it's necessarily

17  questioned whether they believed they were entitled to

18  overtime as much as whether they considered themselves to be

19  more of an employee or an independent contractor, freelancer.

20          THE COURT:  I believe everyone believes that that's

21  a relevant question, whether or not these plaintiffs believed

22  they were employees or independent contractors.  Why isn't

23  that relevant?

24          MR. BERLANGA:  Your Honor, the Fifth Circuit pattern

25  jury charge actually does not instruct the jury on the

1  correct economic realities test.  I prepared a bench brief

2  for the Court on this issue, and we can discuss that now or

3  at a later time.

4          THE COURT:  Well, maybe it's Friday afternoon and my

5  coffee wore off, but I am not following your argument.

6              Earlier I thought you said one of the issues in

7  this trial will be whether or not these plaintiffs were

8  employees or independent contractors.

9          MR. BERLANGA:  That's correct.

10         THE COURT:  Okay.  To the extent that that is a

11  issue and the plaintiffs proffer a reason as to why they

12  believe they were employees, why wouldn't this subject matter

13  fall into that?

14         MR. BERLANGA:  Plaintiffs wouldn't offer an opinion

15  about whether they were employees or independent contractors.

16  The only central inquiry here is what did they do, the job

17  duties, the economic realities of the situation.

18         THE COURT:  Did they ask for overtime?

19         MR. BERLANGA:  In this lawsuit?

20         THE COURT:  No.  When they were dealing with

21  Moments, did they tell someone, hey, we're entitled to

22  overtime?

23         MR. BERLANGA:  No, Your Honor.

24         THE COURT:  Okay.  So you're not going to solicit

25  testimony where this issue even comes up?

1        MR. BERLANGA:  My clients are here to testify about
2   their job duties as that relates to economic realities
3   factors in the amount of time that they worked.  Those are
4   the only operative inquiries for the jury to decide the
5   independent contractor question.  And damages, of course.
6        THE COURT:  All right.
7        MR. BERLANGA:  What the parties believe about the
8   situation is irrelevant.  Courts have said that.
9        THE COURT:  Counselor.
10       MR. KING:  Again, Your Honor, this is straight from
11   the Fifth Circuit's pattern jury instruction.  I think intent
12   is typically a relevant --
13       THE COURT:  I don't have my pattern jury charge --
14   oh, actually, this is a older book; but these have a footnote
15   here, Pattern Jury Charge 11.26.  Looking at the pattern jury
16   charge that he cited for FLSA cases, employee or independent
17   contractor, his number, defense counsel's No. 6 is straight
18   out of the pattern jury charge.
19       MR. BERLANGA:  Yes, Your Honor.  That's correct.
20   And that's why I prepared a bench brief on this issue because
21   we are asking the Court to deviate from the pattern jury
22   instructions for the Fifth Circuit.  And unfortunately the
23   Fifth Circuit --
24       THE COURT:  Why would I deviate from the pattern
25   jury charges of the Fifth Circuit that will review my work?

1    MR. BERLANGA:  Yes, Your Honor.  The issue here is

2    that the pattern jury instructions do not, the test that

3    they're applying here, this is a test that's a hybrid

4    economic realities control test that's applied in Title VII

5    cases.  I don't know why they do this, but this is a test

6    they're instructing here, they're relying on a case called

7    Julino, which is a Title VII case.  And if you look at the

8    elements of the economic realities --

9         THE COURT:  Where does it say that?  I am looking at

10   my pattern jury charge, and I don't see that reference.

11        MR. BERLANGA:  Sure.  I believe it's in the

12   instructions it mentions the test, and they're citing a test

13   called Julino.

14             If the Court will allow me, I can get out my

15   pattern jury charge and direct the Court to it.

16        THE COURT:  It says, "the central issue in

17   determining employee/independent contractor status is the

18   hiring party's right to control the manner and means by which

19   the work is accomplished."

20        MR. BERLANGA:  That is absolutely an incorrect

21   statement of the law.  Courts expressly disclaim the common

22   law notions of control.

23        THE COURT:  So my pattern jury charge book is

24   incorrect?

25        MR. BERLANGA:  100 percent, Your Honor.

1          MR. KING:  Your Honor, I think one of the best cases

2  on the application of the economic realties test in the Fifth

3  Circuit just came down a couple months ago.  It's at Parrish

4  versus Premier Oil Tool Contracting, I believe.  And that

5  opinion goes through how the Fifth Circuit does look at the

6  economic realties test a little bit more broadly than other

7  circuits, Your Honor.

8          And if I recall correctly, I think the opinion

9  mentioned intent.  While it's not dispositive, it is

10  pertinent to the analysis.  It is, after all, a totality of

11  the circumstances test.

12          MR. BERLANGA:  I cited Parrish in my bench brief,

13  Your Honor.  I am relying on that as well.

14          THE COURT:  Do you have a copy of it?

15          MR. BERLANGA:  I don't believe I do at the moment.

16          THE COURT:  Did you file it?

17          MR. BERLANGA:  The bench brief, yes, Your Honor.

18  It's an attachment to the pretrial order.  That's Document

19  No. C -- it's Document No. 43-8.

20          And the economic realties factors are well

21  known.  I mean, they're pretty well established, the degree

22  of control --

23          THE COURT:  Just a moment.

24          I see your bench brief here, but I am still

25  confused as to Motion in Limine 4.  You've titled it the leaf

1    about entitlement to overtime.  You've told me that you do
2    not intend to solicit this information.  So its your
3    expectation that defense counsel is going to solicit a
4    question or pose a question to the plaintiffs:  Do you
5    believe you are entitled to overtime?  That's your belief.
6          MR. BERLANGA:  They're going to solicit testimony
7    from their client that the intention of the parties was to
8    create an independent contractor relationship; solicit
9    testimony from my clients that they understood at the time
10   that they were engaged, you know, that they began working
11   there that they were independent contractors.  And that's not
12   part of the economic realties test.  The elements are here.
13   Intent is not a part of it.  And, in fact, as I said before,
14   I mean, the courts have said the party's intent, they can't
15   override wage, the FLSA.  It's there to protect even -- it's
16   there to protect the workers, even those who would decline
17   its coverage.
18         THE COURT:  But I don't see how the question --
19   well.
20               The instructions that the Court gives will be
21   the instructions that will govern the jury's deliberations.
22   So to the extent that the proper jury instructions are
23   submitted and counsel has -- and, for instance, the jury
24   instructions ask the jury to consider X, Y and Z and defense
25   counsel has used its time with the witness to talk about A,

1 B, C, you believe that that's going to mislead the jury into

2 answering X, Y, Z incorrectly?

3      MR. BERLANGA:  I will submit to the Court that if

4 the Court does instruct the jury in such a way that intent is

5 an element of the economic realties factors, then certainly

6 that would be an appropriate area of inquiry.  That's just,

7 based on the relevant case law, that is not an appropriate --

8      THE COURT:  The problem is, I am not in a position,

9 sitting here today, to craft jury instructions based upon a

10 case I hadn't heard.  And you're arguing a legal point, which

11 I am trying to drill down on, which is very fair.  And so

12 perhaps as to this one I need to wait and do a little bit

13 more homework on it before making a decision on it, because

14 right now the legal argument that you're making is contrary

15 to what I just picked up in my pattern jury charge book, and

16 you've cited me some law that I want to take a look at.

17      MR. BERLANGA:  It was quite a eye opener for me as

18 well seeing that charge, Your Honor.

19      THE COURT:  All right.  Very well.

20      Let's turn our attention to No. 5.

21      MR. BERLANGA:  Again, Your Honor, the party's

22 labeling of the relationship isn't part of, it's not

23 probative of the economic reality of the situation, and again

24 it's --

25      THE COURT:  Entertainer permit agreement.  Is this a

1  agreement that's issued by the state or the city?

2          MR. BERLANGA:  No.  It's a document that Moments

3  crafted and had these entertainers sign without any input

4  from the entertainers, of course.

5          THE COURT:  Counselor, he mentions in this motion in

6  limine there is only one such agreement in existence with one

7  plaintiff.  Is that correct?

8          MR. KING:  That is correct, Your Honor.  I think No.

9  5 ties in with No. 4.

10         THE COURT:  Well, to the extent that we are only

11 talking about one plaintiff with one agreement, that

12 definitely does not flow to other entertainers, correct?

13         MR. KING:  That would be true, Your Honor.

14         MR. BERLANGA:  And, Your Honor, if I may, I believe

15 I misspoke here.  There is one signed document.  It's

16 actually an employment application.  It's not the entertainer

17 permit agreement.  And I asked the corporate representative

18 about --

19         THE COURT:  So there are no permit agreements?

20         MR. BERLANGA:  They haven't produced any signed

21 entertainer permit agreement.

22         THE COURT:  Okay.  So why is this even for my

23 consideration then?

24         MR. BERLANGA:  They have offered it as an exhibit.

25         THE COURT:  Is it signed by a plaintiff?

1      MR. BERLANGA:  No.

2      THE COURT:  Is that correct, counselor?

3      MR. KING:  I don't believe that's correct, Your

4  Honor.  I think it's signed by Mr. Lasko.

5      MR. BERLANGA:  I may be mistaken, Your Honor, but

6  that's my understanding.

7      And I will also tell you that the corporate

8  representative testified that none of the dancers signed it

9  because it wasn't implemented at the time that they were

10  hired.  That's the testimony of the corporate representative.

11  I could be getting my -- that's his testimony.  Now, whether

12  that actually --

13      THE COURT:  5 is granted for now, and so approach me

14  and let me see this permit agreement before any reference or

15  usage of it.

16      Item No. 7, I mean 6.  I'm sorry.

17      MR. BERLANGA:  Your Honor, I think it's the -- well,

18  I know for a fact that it's defendants' intent to offer

19  criminal convictions for prostitution at least for one of the

20  class members.  I don't think it's admissible.  I think it's

21  completely prejudicial.  First of all I would say that there

22  is going to be, there may be testimony that they were

23  arrested for prostitution.

24      THE COURT:  Arrests are not probative, but are there

25  convictions?

1      MR. KING:  Yes, Your Honor.  There are several

2  convictions for one of the plaintiffs.

3      MR. BERLANGA:  It's my understanding that unless the

4  defendant can show in the jurisdiction where the offense was

5  committed that's punishable by death or imprisonment of more

6  than a year, then it's not admissible.

7      THE COURT:  What was the conviction?

8      MR. KING:  It was for prostitution, Your Honor,

9  which is a crime of moral turpitude.

10      MR. BERLANGA:  That's not the standard under the

11  federal rules, Your Honor.

12      MR. KING:  If I might, Your Honor, I might be able

13  to short-circuit this.

14      THE COURT:  Yes.

15      MR. KING:  We have no intention of belaboring

16  somebody's criminal convictions unless it's brought up, and

17  we'd be happy to approach the bench before we get into those

18  kinds of matters.

19      THE COURT:  It's granted.

20          No. 7.

21      MR. BERLANGA:  Tax returns, Your Honor.  They're not

22  relevant to any party's claim or defense.  The plaintiffs

23  weren't paid any wages by Moments, so anything having to do

24  with their income is irrelevant.  I have cited cases here for

25  that proposition.

1    THE COURT:  They were not paid what by Moments?

2    MR. BERLANGA:  They were not paid any wages

3    whatsoever.  That's undisputed.

4    MR. KING:  Your Honor, there is testimony that the

5    club does send 1099 forms to the dancers if they have

6    accepted fees by a credit card from patrons.  So to that

7    extent it may be relevant.  We have no intention of

8    belaboring any points about whether or not you reported your

9    income taxes.  And if that issue should come up, we'd be

10   happy to approach the bench.

11   THE COURT:  7 is granted.

12   Finally, No. 8.

13   MR. BERLANGA:  Your Honor, we are moving here to

14   exclude any testimony that would contradict the corporate

15   representative's testimony without an explanation for the

16   contradiction.  That's the standard for admitting testimony

17   that contradicts corporate representative testimony.

18   THE COURT:  How do we know that?  If someone is

19   called to the stand and they truthfully answer a question

20   that contradicts something that someone else says, I mean,

21   how do I motion in limine that out, because I don't know what

22   the answer will be until I hear it, and you won't know what

23   the answer will be until you hear it.

24   MR. BERLANGA:  Your Honor, I think this limine point

25   is geared towards evidence regarding the hours worked by my

1  clients.  The 30(b)(6) representative testified under oath, I

2  don't know how many hours they worked because we didn't keep

3  track of their hours, and they just came and went as they

4  pleased.  So to the extent they're going to put floor

5  managers --

6        THE COURT:  Okay.  I get that.  But if the corporate

7  representative said one thing and a managers comes to the

8  stand and is asked a question and his recollection is

9  different from the corporate representative, how do you know

10 what his recollection is until the question is asked and

11 answered?

12       MR. BERLANGA:  Well, Your Honor, the corporate

13 representative should have talked with these people and been

14 prepared to testify and bind the corporation at his

15 deposition.

16       THE COURT:  I get that.  But we all know that that's

17 not always the reality.  People have differing recollections

18 all the time.  And if the corporate rep has testified under

19 oath, that's his -- was it a him?

20       MR. BERLANGA:  Him.

21       THE COURT:  That's his testimony.

22            But to the extent a manager or someone else is

23 called to the stand and they have a different recollection,

24 you are not going to know that that's a differing

25 recollection until the question is asked and answered.  And

1  by putting a motion in limine in front of me saying that you

2  cannot have a differing recollection from the corporate rep,

3  I think that's putting a improper box around someone's

4  potential truthful testimony.

5       MR. BERLANGA:  Your Honor, I appreciate the Court's

6  concern about not knowing what the testimony is in advance,

7  although I think it can be limineed out.  If it comes out on

8  the stand, then, you know, we can just remind or I guess --

9  yeah, practically it's an issue; but should that arise,

10  should these managers contradict the corporate

11  representative, I'd make an appropriate objection at the

12  time.

13       THE COURT:  Well, it seems then you have two sworn

14  testimonies from the party that you are suing that differs.

15  I don't see why that's a bad thing for you from a practical

16  standpoint.  Maybe I am still missing this or I've been out

17  of sitting in the lawyer's chair for a long time; but if I

18  have two representatives of a party saying two different

19  things, that was something I made a lot of hay of in front of

20  a jury.

21       MR. BERLANGA:  Well, Your Honor, one of the issues

22  is the corporate rep will disclaim knowledge of everything:

23  Well, I don't know, I don't know, and then they put --

24       THE COURT:  That's even before you, is it not, if he

25  sits there and he's supposed to be the person who knows all

1   and all of a sudden when he's on the hot seat now he doesn't

2   know anything.  12 people, or whatever number we put in the

3   box, will be able to figure that out quickly.

4            MR. BERLANGA:  I understand that, Your Honor.  It's

5   not a -- if the corporate rep disclaims all knowledge of a --

6            THE COURT:  You've taken his deposition.

7            MR. BERLANGA:  And he has on certain, on several

8   issues.

9            THE COURT:  All right.  8 is denied.

10            Any other pretrial matters from the plaintiff?

11            MR. BERLANGA:  Your Honor, I think we touched on the

12   issue of the jury charge in the limine conference; and as I

13   understand, I think the Court is going to rule on that at a

14   later time?

15            THE COURT:  Well, how long do you anticipate this

16   trial lasting?

17            MR. BERLANGA:  I think it's probably a

18   two-to-three-day trial.

19            THE COURT:  So you think the jury is going to get

20   this case Tuesday, Wednesday, when?

21            MR. BERLANGA:  If we start Monday, Your Honor?

22            THE COURT:  We are going to start Monday.

23            MR. BERLANGA:  I would imagine that the jury will

24   get the case on Wednesday.

25            THE COURT:  Okay.  So we will have Monday and

1   Tuesday to address issues with the jury charge.

2            MR. BERLANGA:  Yes, Your Honor.

3            THE COURT:  So are there pretrial matters you need

4   to tend to today?

5            MR. BERLANGA:  I think we may have covered it.

6   Unless counsel has another position on it, I believe that's

7   it, Your Honor.

8            THE COURT:  All right.

9            MR. BERLANGA:  Although there are exhibits.  I think

10  we have some objections to exhibits on both sides perhaps.

11           THE COURT:  Have you offered any exhibits for

12  preadmission?

13           MR. BERLANGA:  No, we haven't.

14           THE COURT:  So you have no objections that I am

15  aware of for anything that's been offered.  I don't know

16  what's going to be offered.

17               So are you offering any exhibits at this time

18  for preadmission?

19           MR. BERLANGA:  Not at this time, Your Honor.

20           THE COURT:  All right.  So plaintiff has nothing

21  else at this time?

22           MR. BERLANGA:  No, Your Honor.

23           THE COURT:  Any pretrial matters from the defense?

24           MR. KING:  Yes, Your Honor.  I will get in touch

25  with Mr. Berlanga over the weekend and see if we can

1  stipulate to some of these issues and flesh out our

2  objections to anything and present them to the Court on

3  Monday.

4           THE COURT:  Very well.

5           MR. KING:  Defendant does have a couple of motions

6  in limine.

7           THE COURT:  And your motion in limine, is it part of

8  the pretrial order?

9           MR. KING:  Yes, Your Honor.

10          THE COURT:  So that's 43 what?  Do you have a hard

11  copy of it, counselor?

12          MR. KING:  I do, Your Honor.  It was a motion in

13  limine from the prior docket call.  And I will use this one.

14  It will suffice.  This is Document No. 27.

15          MR. BERLANGA:  Oh, I might have an extra copy.

16          THE COURT:  I have Document No. 27, which is

17  defendants' motion in limine.

18              And there is an amended one?

19          MR. KING:  It should have been filed with the joint

20  pretrial report, Your Honor.

21          MR. BERLANGA:  Document 27 is what I have.

22          THE COURT:  And could you print that out for me,

23  please.

24              And, counsel, I note that there are 17 motions

25  in limine on here.  And if you have not read my court

procedures, I do not need a motion in limine telling me that we need to follow the rules of procedure or the rules of evidence.  If there is something particular to this case that you need to bring my attention to, I will do that; but I am not going to sit here and go through motions in limine regarding the rules of evidence and civil procedure.  That's unnecessary.  That's why we have the rules of procedure and the rules of evidence.

So with that being said, are there specific motions in your motions in limine that you need to bring my attention to?

MR. KING:  Yes, Your Honor.  The first one is No. 1. We anticipate that plaintiffs are going to offer screen shots from various websites about the club, and we don't think that they are --

THE COURT:  Well, this is a exhibit question, is it not?

MR. KING:  It is an exhibit question, Your Honor.

THE COURT:  Well, he hadn't offered anything.  We don't know what he is going to offer.  And I think you've just told me that you are going to visit with him about these issues as to what he actually intends to offer, and so can we address it that way first and foremost.

MR. KING:  Certainly, Judge.

THE COURT:  What's next?

1      MR. KING:  No. 4.  We do anticipate that there will

2  be questioning to our corporate representative as to whether

3  or not he's aware of statutory definitions via case law

4  addressing exotic dancer classification.  We think those

5  questions are purely misleading and are also not relevant.

6      THE COURT:  Counselor.

7      MR. BERLANGA:  Your Honor, one of the central issues

8  in this case and one of the defenses raised by defendant is

9  willfulness.  And the central issue of willfulness is did the

10  defendant recklessly disregard whether they were complying

11  with the FLSA.  So I don't know why I wouldn't be allowed to

12  ask the defendant about his knowledge of FLSA requirements,

13  whether he did any investigation, what his understanding was

14  about the decision to classify these workers as independent

15  contractors as opposed to employees.

16      MR. KING:  The concern, Your Honor, is questioning

17  to the effect of:  Are you aware of the other 90 district

18  court opinions from all across the country that exotic

19  dancers are employees?

20      THE COURT:  Motion in Limine No. 4 is denied with

21  the understanding that you're going to be asking this witness

22  about his knowledge as to the FLSA in regards to the hiring,

23  retention of these particular plaintiffs, not as to whether

24  or not he's a FLSA expert.  And so, counsel, if there is an

25  improper question, object and it will get sustained.

1          MR. KING:  Yes, Your Honor.

2          THE COURT:  What's next?

3          MR. KING:  No. 5.  Defendant is seeking the

4   exclusion of evidence regarding how other clubs operate,

5   specifically if there's another club that our corporate

6   representative managed.  And we have concerns that

7   plaintiffs --

8          THE COURT:  At the same time he was managing

9   Moments?

10         MR. KING:  Early on, yes, Your Honor.  And that

11  there will also be questioning about how other clubs work.

12         THE COURT:  What's the relevance of another entity

13  that's not a party to this litigation?

14         MR. BERLANGA:  Your Honor, I think it also goes to

15  willfulness, state of mind.  I mean, if this --

16         THE COURT:  If you are talking about the corporate

17  rep for a defendant in this case, his knowledge or actions

18  with another entity which is not a party to this action,

19  what's the relevance?

20         MR. BERLANGA:  Again, Your Honor, I would say that

21  it goes to the willfulness.

22         THE COURT:  5 is granted.

23              What's next?

24         MR. KING:  No. 6.  Any evidence or questioning to

25  the effect that Texas Sugars has decided to classify exotic

1    dancers as independent contractors to avoid paying payroll

2    taxes.  It's unduly prejudicial.  There is no basis in any of

3    the deposition testimony for that.  It's pure deceit.

4              THE COURT:  For a case that's about whether or not

5    the plaintiffs in the case are employees or independent

6    contractors, there are a awful lot of motions in limine to

7    prevent people from talking about whether or not there were

8    employees or independent contractors.  This is quite odd to

9    me.  So to the extent that there were discussions as to how

10   to classify them, that's relevant, is it not?

11             MR. KING:  It is relevant, Your Honor.

12             THE COURT:  So why in this particular motion in

13   limine if there was a discussion by one of the parties as to

14   classifying them a certain way, for whatever reason, why

15   isn't that relevant to get to the bottom of whether or not

16   they were classified as employees or independent contractors?

17             MR. KING:  Solely if those questions are asked in

18   terms of, you did this to avoid paying taxes, Your Honor.

19             THE COURT:  6 is denied.

20               What's next?

21             MR. KING:  No. 12, Your Honor.

22             THE COURT:  Well, I think that goes both ways.  And

23   to the extent that there has not been documents that were not

24   produced, timely produced, evidence not timely produced, we

25   are not going to see it for the first time in front of this

1    jury.  And that goes 360.  We're clear on that?

2           MR. KING:  Yes, Your Honor.

3           MR. BERLANGA:  Yes, Your Honor.

4           THE COURT:  All right.

5              So what's next?

6           MR. KING:  That is it for the defendant except for

7    the fact we have a different idea of how long this trial

8    might take, Your Honor.

9           THE COURT:  How long do you believe it will take?

10          MR. KING:  It might take up to four days.

11          THE COURT:  From picking the jury through a verdict.

12   So you think that we're going to go through the end of

13   Thursday?

14          MR. KING:  I think that's a very distinct

15   possibility.  We have two named plaintiffs, three opt-in

16   plaintiffs, we have four witnesses that we intend to call,

17   the dancers counsel's referring to, and a corporate

18   representative and possibly one manager.

19          THE COURT:  Is that 11 witnesses?  You said two

20   named plaintiffs, three opt-in, the other four, a corporate

21   representative, and what was the other one?

22          MR. KING:  And a manager.

23          THE COURT:  And a manager.  So that's 11 witnesses.

24   I don't see how we are going to do that in two days, if that

25   holds.  That may not hold, in the sense of duplication, or

 1   not duplication, triplication.  I don't mind hearing

 2   something twice, but I really don't want to hear it three

 3   times.

 4              And so, with that being said, you still think

 5   it's going to be 11 witnesses?

 6         MR. KING:  I do, Your Honor.  And I understand the

 7   Court's concern about being very efficient during the

 8   examination of these witnesses to avoid redundant, cumulative

 9   testimony.

10         THE COURT:  Well, more importantly, since you

11   gentlemen are trial lawyers, you know how juries react to

12   that, wasting of their time, taking time away from their

13   private lives to come down here to hear a story in four days

14   that they could have heard in two, and their reaction to

15   that.  So it's important that we be mindful of their time and

16   their service to come down here.

17              So that being said, you say four days?

18         MR. KING:  I think it could take up to four days,

19   Your Honor.

20         THE COURT:  Fair enough, because I would hate to

21   tell this panel when they come in on Monday that we're going

22   to take two days and we are here Thursday, because they

23   definitely won't take kindly to that.  So all right.

24              Anything else from the defense?

25         MR. WALLACE:  The only thing, for trial preparation

1  purposes, we do plan to bring our four dancer witnesses.

2  Does the plaintiff also plan to bring all of his opt-ins and

3  his two named plaintiffs?

4          MR. BERLANGA:  At this point we intend to bring

5  plaintiffs.

6          MR. WALLACE:  So just two people?

7          THE COURT:  I think your co-counsel just said two

8  named plaintiffs plus three opt-ins.  That's five by my

9  count.

10          MR. KING:  That's correct.  One of the opt-ins just

11  dropped out, Your Honor.

12          MR. WALLACE:  Is that number correct?

13          MR. BERLANGA:  Five.

14          THE COURT:  Yes.  Let him finish.  Anything else

15  from the defense?

16          MR. KING:  This raises another issue about how

17  trials should proceed as far as the opt-ins are concerned,

18  whether they're going to be treated as parties.  Our position

19  is that they should be treated as parties for purposes of

20  this trial and that the plaintiffs should not be allowed to

21  put on representative evidence.  In other words, the jury

22  needs to make findings as to these specific opt-ins.  We

23  can't just have the plaintiffs coming up, giving their

24  testimony and the jury be asked to decide classification

25  issues for the opt-ins, opt-ins' damages, things of that

1  nature, Your Honor.

2  MR. BERLANGA:  Your Honor, this case was certified

3  as a collective action.  The point on the collective action

4  mechanism is to allow representative discovery.  So I think I

5  am entitled to rely on representative discovery.  As I said,

6  at this time I plan on bringing all of my witnesses; but if

7  one of them doesn't come, I am still entitled to because it's

8  collective action.

9  THE COURT:  We'll cross that bridge when we get to

10  it.  Your anticipation is that the named plaintiffs and the

11  three opt-ins will be on the stand?

12  MR. BERLANGA:  Yes, Your Honor.

13  THE COURT:  All right.

14  MR. KING:  And I believe we will have to address the

15  arguments of counsel perhaps when we are talking about the

16  jury charge because we would like their names on there.

17  THE COURT:  Exactly.

18  MR. KING:  The last matter is that in the pretrial

19  order counsel has mention that one of the opt-ins has decided

20  to withdraw from this case.  We have not seen any formal

21  notice of withdrawal at this point, so we're a little

22  confused about the status of that issue.

23  MR. BERLANGA:  I can file a notice of withdrawal

24  with the Court, Your Honor.

25  THE COURT:  Is that one of the three?

1          MR. BERLANGA:  It's one of the opt-ins, yes.  She

2    called me up, said I don't want to participate anymore.  She

3    wouldn't expand.  I said, I will let the Court know.

4          THE COURT:  You're on the record right now.  Let me

5    know.

6          MR. BERLANGA:  Yes.  Laura Torres, opt-in plaintiff

7    Laura Torres indicated she desires to withdraw, so I am going

8    to withdraw her notice and concept.

9          THE COURT:  Any objection?

10          MR. KING:  No, Your Honor.

11          THE COURT:  So ordered.  So now we're down to four.

12    Is that correct?

13          MR. BERLANGA:  No, Your Honor.  We had six.  Now we

14    are down to five.

15          THE COURT:  Oh, so she was not -- so it was two

16    named plaintiffs and three opt-ins that would testify.  She

17    was not one of the three that you anticipated testifying?

18          MR. BERLANGA:  Correct.

19          THE COURT:  Very well.  All right.

20               Anything else, sir?

21          MR. KING:  That is it for defendant, Your Honor.

22          THE COURT:  All right.

23               You got your hand up.

24          MR. BERLANGA:  Yes, Your Honor.  And I apologize.

25               There is one issue on defendants' motion in

1  limine.  No. 16, we initially I think indicated we --

2          THE COURT:  I don't think he presented 16 to the

3  Court for consideration.

4          MR. BERLANGA:  Yes, Your Honor.  We, I think,

5  initially indicated we were unopposed.  We are actually

6  opposed to No. 16.

7          THE COURT:  He didn't bring it up.  He hadn't

8  presented it to me, so you don't have to tell me you're

9  opposed to something that he hadn't brought up.

10          MR. BERLANGA:  Fair enough.

11          MR. KING:  Your Honor, to the extent that counsel

12  intends to add exhibits to his exhibit list which is

13  correspondence between counsel, I will make the objection at

14  trial.

15          THE COURT:  Very well.  Any other questions?

16              Have a seat.

17              I don't recall -- my memory is bad after 10

18  years and two courts -- as to whether or not you have

19  appeared before me in trial.  I will go over my procedures.

20              For the voir dire, we will probably get the

21  panel up here around about 10:00 o'clock, 10:30.  For a

22  week-long trial -- I got burned on a trial a while back, so

23  we will probably seat eight jurors.  In case we lose someone

24  we will still have a sufficient number.

25              I do 80 percent of the voir dire myself,

1   inquiring into bias or prejudice that may prevent them from

2   being a fair and impartial juror.  I can give you some time

3   to introduce yourself and your clients who are present in the

4   courtroom or your corporate representative and to drill down

5   on specific panel members who you have seen answer questions

6   from me or you have seen their questionnaire.  So can you do

7   that in 20 minutes apiece?

8           MR. KING:  I think so, Your Honor.

9           MR. BERLANGA:  Yes, Your Honor.

10          THE COURT:  Very well.

11          And so after we seat the jury we will proceed

12  to opening statements.  You are not allowed to use anything

13  in opening statements that has not been admitted or cleared

14  with the Court beforehand.  So if you intend to use something

15  by way of exhibit or demonstrative, get it cleared before you

16  do so.

17          By way of questioning a witness, you may

18  question a witness from one of three spots.  You can do it

19  from counsel table while standing or seated, you may do it

20  from the podium, or you may be in the well of the court.

21  However, wherever you take up, with the exception of the

22  podium, do not take up a spot that blocks opposing counsel's

23  view of the witness.  Counsel is supposed to have a direct

24  line of sight to the witness at all times as the witness is

25  answering questions.

1          You will get two opportunities to question a
2   witness and two only:  Direct, redirect, cross and re-cross.
3   Barring exceptional circumstances you will not be given a
4   third opportunity.

5          Ask to approach a witness during a examination
6   for the first time, be it direct or redirect or cross or
7   re-cross.  Once you have been granted permission to approach
8   the witness the first time, you do not have to ask a second
9   time.  You may go back and forth between the witness as
10  needed to conclude your examination.

11         Adult witnesses, which I believe we all are
12  contemplating here, are to be addressed as Mr. or Mrs.  We
13  are not going to use first names.  We're in a formal place
14  and we are going to be formal.  We use formal titles.  And
15  counsel is to be addressed that way.

16         Stand when speaking to the Court.  By way of
17  objections, no speaking objections.  If you have an
18  objection, stand, and objection, relevance; objection,
19  hearsay.  If I need you to expand on your objection I will
20  ask.  70 percent of the time I don't even need a response to
21  an objection.  I am able to rule on an objection based upon
22  you stating your objection and me understanding what that
23  means.  Sometimes I will also give you an opportunity to
24  respond because sometimes you need to make a record, and I
25  understand that as well.  But your basic run-of-the-mill

1  trial objection I will be able to rule on such that we can

2  keep the proceedings rolling.

3              Trial starts at 9:00 o'clock sharp each

4  morning.  We will take a midmorning break at approximately

5  10:30 for approximately 15 minutes.  We will resume and go to

6  noon.  We will break for lunch for one hour.  We will resume

7  at 1:00 o'clock.  We will take a mid-afternoon break at some

8  point between 2:45 and 3:00 o'clock.  We will take another

9  15-minute break and then go to the end of the day at 5:00

10  o'clock.  Each day the goal will be to conclude at 5:00

11  o'clock.  If there is a natural breaking point at 4:50, we'll

12  stop at 4:50.  If a natural breaking point can be reached at

13  5:05, we will go a extra five minutes; but the goal each day

14  is to conclude at approximately 5:00 p.m.

15              This is very important so listen carefully.

16  If you have a issue that you need to bring to my attention,

17  be it you are going to object to a exhibit, something came up

18  overnight that you need to bring to my attention, you need to

19  arrive early and do so.  I do not want to walk out here at

20  9:00 o'clock or 8:55 getting ready to bring in the jury and

21  you tell me, Judge, we have something for you and we're here

22  at 9:20 trying to work through something while the jury is

23  back there cooling their heals.  I typically get here

24  approximately 8:00 o'clock in the morning.  I am sitting in

25  chambers getting ready for the day.  All you have to do is

1  let the law clerk or Ms. Edwards, the case manager, know that

2  you need to see me, I will come out at 8:30 and sit and go

3  through whatever we need to go through.

4          Also, I am prepared over the break, the

5  15-minute break, to entertain something that we can do in

6  five minutes.  I am prepared to work part of the lunch hour.

7  I will stay from 12:00 to 12:15 or 12:20 or I'll come back at

8  12:45 to get something done so that we can resume at 1:00

9  o'clock.

10         I will stay after hours, after 5:00 o'clock to

11  deal with any issue that you think may come up or has come up

12  during the day or that you anticipate coming up the next day.

13  Again, do not have me walking out here at the beginning of

14  the day, the return of a break, the return of lunch and tell

15  me you need to take up my time for something that's going to

16  take greater than one minute, because I am going to respect

17  the jurors' time to be in and out of here as efficient as

18  possible.  And to do that, again, I am prepared to work

19  before we start, after the day has concluded or during any of

20  the breaks that we have during the day.  Are we clear on

21  that?

22         MR. KING:  Yes, Your Honor.

23         MR. BERLANGA:  Yes, Your Honor.

24         THE COURT:  All right.

25             Only water at table, at the counsel table.  I

1  am only drinking water.  Only the jurors are allowed to drink
2  water.  We have nice, new carpet that the taxpayers have paid
3  for, and I do not want it stained with coffee or soft drinks.
4  Obviously no chewing of gum or eating in the courtroom.  We
5  supply water during the trial.  There will be mugs.  But if
6  you want to bring your own bottled water with a top, you are
7  free to do that as well.

8              Each of you will be supplied with a attorney
9  ready room which is right off the hallway where you can have
10  your witnesses, your trial boxes or meet with witnesses
11  during the day or have your lunch break or whatever.  If you
12  have trash from your lunch hour or whatever, make sure it
13  goes in the trash can.  The cleaning crew will not throw away
14  anything in your room unless it's in the trash can, so please
15  help us help them by keeping those rooms clean.

16             You are not to go in each others ready room
17  unless you are invited.  That's your office away from your
18  office when you are down here at trial, and we respect it as
19  such.

20             Any questions about the trial procedures?

21             MR. KING:  Yes, Your Honor.

22             THE COURT:  Yes, sir.

23             MR. KING:  Are we allowed to have laptops at counsel
24  table?

25             THE COURT:  Yes.  Thank you for mentioning.  Yes,

1   you are allowed to have laptops.  No cell phones.  I will not

2   allow a juror during your examinations to pull out his or her

3   cell phone and start checking their text messages.  And since

4   I tell them that, it's rude to them for a lawyer to pull out

5   his or her cell phone and use it while in court.  So if you

6   need to use -- some folks need to check their cell phones,

7   step outside the well of the court, outside the bar and do

8   so, and that's fine.

9           If he has a witness on the stand, there are a

10  couple lawyers sitting at the table and one of you needs to

11  walk out, you can do so.  I mean, just look up at me, nod, I

12  know that you're stepping out for a moment and that's fine;

13  but don't check your cell phones at counsel's table.

14          Yes.  Any other?

15          MR. KING:  If counsel wants to publish an exhibit to

16  the jury, should we ask the Court permission first to do so?

17          THE COURT:  If it has been admitted, I'd appreciate

18  a heads-up, because I need written exhibit lists.  So when

19  you have your exhibits, give me a list because I keep a list

20  of what you have, and what I do is check that in fact that

21  it's admitted.  And so, I do that for every time.  It's just

22  kind of a way of me staying in the game, okay.

23          If you don't say publish, tell me what you have

24  put up, I am showing you on the screen what is Defense

25  Exhibit No. 2 so that I can look down to the defense evidence

1  and I will know.  If it's not in evidence, then I'll assume,
2  counsel, it's not in evidence and I will know.
3            For panel size, I don't think we will need more
4  than 30.
5            MR. WALLACE:  Your Honor, if I may.  I'm Casey
6  Wallace.  I'm with Mr. King.
7            I have tried a number of these cases with
8  exotic dance-type clubs; and we have found that the typical
9  panel, there is a lot of panel members who are struck for
10  cause because they have biases.  You may want to increase it
11  from 30.  It's your call, Judge.
12            THE COURT:  We've increased it.  We usually get 24,
13  and so we are going up to 30.  We'll do 36.
14            MR. CASEY:  Yes, Your Honor.
15            THE COURT:  Yes, sir.  Any other questions?
16            MR. KING:  Will we have an opportunity to use the
17  courtroom technology?
18            THE COURT:  Yes, excellent, another excellent
19  question.
20            I have been having some problems with my
21  technology, and I don't know if it's up and running yet; but
22  show up, either hang out after we are done today and take a
23  look at it and figure it out.  Ms. Edwards will be happy to
24  help you.  Show up Morning morning earlier than anticipated
25  because, like I said, we won't get a panel up here until

1    10:00 o'clock at the earliest, and play with it and figure it

2    out and make sure your laptop, if you're going to do it on

3    your laptop, it ties in and the cords all work, you are free

4    to do that.

5            MR. KING:  Thank you, Judge.

6            THE COURT:  Anything else about pretrial procedures?

7            MR. KING:  I think that's it, Your Honor.

8            THE COURT:  Yes, sir.

9            MR. BERLANGA:  He covered it for me.

10           THE COURT:  I say this to every -- I have tried now

11   probably over a hundred jury trials and I say this to every

12   group of lawyers.  Your professionalism is very important to

13   me and is on display.  The folks who come down here for jury

14   service, they get the wrong idea of what we do at a

15   courthouse from these silly TV shows and elsewhere.  When

16   they see real judges, real lawyers at work, they get a better

17   appreciation for our profession.  That professionalism is

18   important.  It starts with me, it starts with my court staff,

19   but it also includes you gentlemen.  So that's what I expect

20   to be on display, that when these jurors, the jury panel who

21   are not selected, the jurors who are selected, when they

22   leave this courthouse, they're going to have a great

23   appreciation for our profession because they've seen

24   professionals at work.

25                If you have a beef, a issue that is

1   hair-raising and your hair is on fire, raise your hand, let
2   me know, I will get the jury out of the courtroom and I will
3   let you bring up whatever you have to do; but we are not
4   going to be lobbing insults and barbs at each other in the
5   presence of this jury because I want to make sure that they
6   understand the importance of what we do and how we do it.
7   And so that's my soapbox speech, and so that's what I expect
8   from you.
9               All right.  Anything else?
10              MR. BERLANGA:  Not for plaintiffs, Your Honor.
11              THE COURT:  This weekend when you are discussing the
12  case, I want a short, joint statement of the case because I
13  will read that to the jury panel as to what this case is
14  about, something very brief as to what it's about.  So that
15  goes to Mr. Wallace's point, when I am telling them this case
16  concerns X such that I can then inquire of any prejudice or
17  biases that may result from them knowing that they're going
18  to be serving as a juror on this type of case.  So that's an
19  important little piece.  But y'all can confer as to how that
20  should read.  And you might already have it in your joint
21  pretrial, but it's just a little, short statement as to what
22  the case is about.
23              MR. KING:  When would you like this made, Your
24  Honor?
25              THE COURT:  Because the panel is going to be up here

1  at 10:00 o'clock, just bring it in Monday morning with you.

2  And so I will look at it Monday morning and say, yeah, this

3  works and then that will be what I will use to voir dire the

4  panel.

5          I don't anticipate any issues, but out of

6  abundance of caution, why don't you report back here 9:00

7  o'clock Monday morning, and that way that gives us a hour for

8  anything that may come up.  If there are legal issues,

9  arguments that come up over the weekend, we will have that

10  hour or so to address them before the panel comes up at

11  approximately 10:00 o'clock.

12          All right.  Anything else?

13          MR. BERLANGA:  No, Your Honor.

14          MR. KING:  No, Your Honor.

15          THE COURT:  And written exhibit lists.  Don't

16  forget, I need those Monday morning as well, what you intend

17  to use, because again, I use the hard copies.  That's going

18  to be one for defense and one for the plaintiff.

19          All right, gentlemen.  Enjoy your weekend of

20  working to prepare for trial.  And I may not be out here at

21  9:00 o'clock if you don't need me, but I will probably poke

22  my head out to see if anything came out; but that gives you

23  the opportunity to come out and hunt down anything that you

24  need.

25          Enjoy your weekend.

CERTIFICATION

1

2

3

4

5        I, Fred Warner, Official Court Reporter for the

6   United States District Court for the Southern District of

7   Texas, Houston Division, do hereby certify that the foregoing

8   pages 1 through 52 are a true and correct transcript of the

9   proceedings had in the above-styled and numbered cause before

10   the Honorable ALFRED H. BENNETT, United States District

11   Judge, on the 14th day of June, 2019.

12        WITNESS MY OFFICIAL HAND at my office in Houston,

13   Harris County, Texas on this the 6th day of July, A.D., 2020.

14

15

16

17

18                         /s/ Fred Warner
                          Fred Warner, CSR
19                      Official Court Reporter

20

21

22

23

24

25